**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KENNETH T. CORTEAU, et al.<br>　　　Plaintiffs,<br><br>　　　v.<br><br>TEACHERS INSURANCE CO.<br>　　　Defendant. | No. 3:16-cv-00580 (MPS) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

## I.　　Introduction

Plaintiffs Kenneth Courteau and Cheryl Courteau filed this action against their homeowner's insurance provider, Teachers Insurance Company, for failure to pay for damages to the basement walls of their home caused by cracking concrete. The plaintiffs brought claims of breach of contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), and unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a–816 et seq. ("CUIPA") and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42–110a et seq. ("CUTPA"). In my ruling on the defendant's motion to dismiss, I dismissed the plaintiffs' CUTPA claim. (*See* ECF No. 30 at 1.) Now before me is the defendant's motion for summary judgment with respect to the plaintiffs' remaining counts. (ECF No. 31.) For the reasons that follow, I grant the defendant's motion.

## II.　　Background

### A.　　Factual Background

The following facts, which are taken from the parties' Local Rule 56(a) Statements and the exhibits, are undisputed unless otherwise indicated. "Plaintiffs Kenneth and Cheryl Courteau have lived at 98 Winwood Circle, Somers, Connecticut ("the Property") continuously since

2006."  (ECF No. 33, Defendant's Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") at ¶

1; ECF No. 36-1, Plaintiffs' Local Rule 56(a)2 Statement  ("Pl.'s L.R. 56(a)2 Stmt.") at ¶ 1.)

The defendant "insured the Property under separate policies of insurance, each with one year

terms, beginning on October 1, 2006 and continuing until October 1, 2016."  (Def.'s L.R. 56(a)1

Stmt. at ¶ 2; Pl.'s L.R. 56(a)2 Stmt. at ¶ 2.)  During the plaintiffs' tenure in the Property,

"Plaintiff Kenneth Courteau had seen all along what he characterized as normal wear and tear

cracks in the house concrete."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 3; Pl.'s L.R. 56(a)2 Stmt. at ¶ 3.)

"In or around September 2015, Plaintiffs received an offer to purchase their home, which they

accepted.  The deal fell through, however, when the prospective buyers obtained a home

inspection report that contained negative findings concerning the foundation and garage

concrete."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 4; Pl.'s L.R. 56(a)2 Stmt. at ¶ 4.)

"On October 19, 2015, Plaintiffs submitted an insurance claim to [the defendant]."

(Def.'s L.R. 56(a)1 Stmt. at ¶ 5; Pl.'s L.R. 56(a)2 Stmt. at ¶ 5.)  After "[a]n adjuster retained by

[the defendant] inspected the Property on October 22, 2015," the defendant "denied Plaintiffs'

claim by letter dated October 26, 2015."  (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 6-7; Pl.'s L.R. 56(a)2

Stmt. at ¶¶ 6-7.)  The plaintiffs' insurance policies with the defendant took two forms between

2006 and 2016.  "From October 1, 2006, when Plaintiffs first insured with [the defendant],

through October 1, 2013, the [defendant's] Policy ("Policy") did not contain any applicable

coverage for collapse of a building or part of a building."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 10; Pl.'s

L.R. 56(a)2 Stmt. at ¶ 10.)  The versions of the Policy used thereafter contained "incidental

coverage, applicable to direct physical loss to covered property involving the collapse of a

building or part of a building."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 8 (internal quotation marks

omitted); Pl.'s L.R. 56(a)2 Stmt. at ¶ 8.[1])  The post-2013 Policy defined the "collapse of a building or part of a building" as "an abrupt caving in, falling in, falling down, or giving way of the building or the part of the building that prevents the building or the part of the building from being occupied for the purpose for which it was intended just before caving in, falling in, falling down, or giving way . . . ." (*Id.*)  It also stated that "the following are not considered to be in a state of collapse: a) a building or part of a building that has not caved in, fallen down, or given way even if it displays evidence of bending, bowing, bulging, cracking, expansion . . . and b) a building or a part of a building in danger of caving in, falling in, falling down, or giving way." (Def.'s L.R. 56(a)1 Stmt. at ¶ 9; Pl.'s L.R. 56(a)2 Stmt. at ¶ 9.)

"The damage alleged by the Plaintiffs . . . is the result of a process of deterioration that has been occurring since the concrete [for the Property] was originally poured in 1984 . . . ." (Def.'s L.R. 56(a)1 Stmt. at ¶ 11; Pl.'s L.R. 56(a)2 Stmt. at ¶ 11.)  "Petrographic analysis by Dr. Sidney Carter confirmed that core samples drilled from Plaintiffs' foundation walls contain[] iron sulfide materials, principally pyrrhotite, and that the cracking in the concrete relates to the oxidation of the iron sulfide minerals within the aggregates."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 13 (internal quotation marks omitted); Pl.'s L.R. 56(a)2 Stmt. at ¶ 13.)  Despite these findings, the plaintiffs "currently occupy the Property" and continue to "use [the] basement as they have since they have owned the Property."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 14; Pl.'s L.R. 56(a)2 Stmt. at ¶ 14.)  "No one has told Plaintiffs that the cracks in their foundation walls present a safety hazard," "that the Property or the foundation walls are in imminent danger of falling down, or that they

---

[1] Plaintiffs deny this factual assertion on the basis that it is incomplete but do not otherwise contest the accuracy of the statement.  (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 8 (denying factual assertion but admitting that it "appears to be an accurate recitation of the policy terms")).

need to move out of the property."  (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 15-16; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 15-16.)

### B.      The Plaintiffs' Complaint

According to their complaint, "the plaintiffs were notified [in October of 2015] that the basement walls of their home had a series of horizontal and vertical cracks throughout by way of a home inspection commissioned by a prospective buyer of their home."  (*Id.* at ¶ 6.)  The plaintiffs subsequently "undertook an investigation of the 'pattern cracking' condition," revealing that it had occurred "due to a chemical compound found in certain basement walls constructed in the late 1980s and the early 1990s with concrete most likely from the J.J. Mottes Concrete Company."  (*Id.* at ¶¶ 7-8.)  The plaintiffs allege that "[t]he aggregate used by the J.J. Mottes Concrete Company in manufacturing the concrete in that particular time period contained a chemical compound which, with its mixture with the water, sand, and cement necessary to form the concrete, began to oxidize (rust) and expand, breaking the bonds of the concrete internally and reducing it to rubble."  (*Id.* at ¶ 9.)

After this realization, the plaintiffs claim they "made a timely claim for coverage of the loss in accordance with the terms of the [defendant's Policy] and the policies issued during the preceding years."  (*Id.* at ¶ 15.)  The plaintiffs allege that "[t]he defendant denied [their] claim for coverage by way of [a] letter claiming that the [Policy] does not afford coverage for the condition affecting their basement walls."  (*Id.* at ¶ 16.)  The plaintiffs claim that the defendant denied them coverage under the Policy on grounds contrary to "the express provisions of the [Policy]."  (ECF No. 18 ("Complaint") at ¶ 18.)  As such, they allege a claim of breach of contract against the defendant.  (*See id.* at ¶¶ 1-20.)  The plaintiffs also allege a claim for breach of the implied covenant of good faith and fair dealing on the basis that the defendant

"intentionally cited policy exclusions wholly inapplicable to the plaintiffs' claim for coverage knowing full well that the plaintiffs, like most insureds, are unsophisticated with respect to the complex language contained in insurance policies." (*Id.* at ¶ 24.)

## III. Legal Standard

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted). "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . . , and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

## IV. Discussion

### A. Breach of Contract Claim

The parties' dispute over the plaintiffs' breach of contract claim focuses on the language of the Policy. The plaintiffs argue they are entitled to relief under both the pre-2013 and post-2013 versions of the Policy—or at least that there are factual disputes that preclude summary

judgment. (*See* ECF No. 36 at 4-5.) For the reasons that follow, I conclude that their claims are foreclosed under both versions of the Policy.[2]

### 1. Pre-2013 Policy

"An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract . . . ." *Connecticut Medical Ins. Co. v. Kulikowski*, 286 Conn. 1, 5 (2008) (internal quotation marks omitted). Thus, "[t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy . . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." *Id.* (internal quotation marks omitted). "When interpreting [an insurance policy], [a court] must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." *Johnson v. Connecticut Ins. Guar. Ass'n*, 302 Conn. 639, 643 (2011) (internal quotation marks omitted). "In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Id.* An insurance policy "is ambiguous when it is reasonably susceptible to more than one reading." *Id.* In such circumstances, "any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." *Id.* at 643 (internal quotation marks omitted).

---

[2] As a result of this disposition, I do not address the plaintiffs' argument that the Court should use the "multiple injury trigger" theory to decide which policy or policies apply. (*See* ECF No. 36 at 7.)

Here, the terms of the pre-2013 Policy unambiguously foreclose coverage of the plaintiffs' claim. The pre-2013 Policy covered the plaintiffs' "residence and related private structures on the insured premises for risks of direct physical loss unless specifically excluded." (*See* ECF No. 32-1, Exhibit 1 ("Pre-2013 Policy") at 7.) The pre-2013 Policy sets forth a number of exclusions, however, including the following:

> We do not pay for loss caused by the settling, cracking, shrinking, bulging or expanding of a building structure or mobile home, pavements, patios or other outdoor structures.
>
> . . .
>
> We do not pay for loss which results from one or more of the following: . . . a defect, a weakness, an inadequacy, a fault or unsoundness in materials used in construction or repair whether on or off the insured premises.
>
> We do not pay for loss which results from wear and tear, marring, deterioration, inherent vice, latent defect, mechanical breakdown, rust, wet or dry rot, corrosion, mold, contamination or smog. We do pay for an ensuing loss unless the ensuing loss itself is excluded.

(Pre-2013 Policy at 8, 12.) The pre-2013 Policy does not include any other specific coverage for the collapse of insured property that might conceivably apply here.[3] The defendant claims that the policy exclusions for "cracking" and "defect[s]" in construction materials foreclose the plaintiffs' claim for coverage under the pre-2013 Policy.[4] I agree.

---

[3] Although the pre-2013 Policy also contains limited coverage for "collapse" as to the residence caused by "hidden insect or vermin damage," and as to personal property, (*see* Pre-2013 Policy at 8, 10), plaintiffs do not argue that these provisions apply here.

[4] The defendant also contends that the "wear and tear" exclusion—quoted above—forecloses the plaintiffs' coverage claim. (ECF No. 32 at 14.) The plaintiffs argue that this exclusion does not apply because it encompasses only "ordinary" deterioration and because the defendant failed to timely raise this exclusion. (ECF No. 36 at 12, 14.) I need not address these arguments, however, given my conclusion that the "cracking" and "defect" exclusions apply to the plaintiffs' coverage claim.

The plaintiff's allegations and the evidence in the record characterize the damages to the plaintiffs' property as "cracking," "bulging," or "expanding" of the Property. The plaintiffs' amended complaint repeatedly refers to the damage to the Property as "cracking." (*See* Complaint at ¶¶ 6 ("In October of 2015, the plaintiffs were notified that the basement walls of their home had a series of horizontal and vertical cracks throughout by way of a home inspection commissioned by a prospective buyer of their home."), 7 ("The plaintiffs immediately undertook an investigation of the 'pattern cracking' condition, its cause, and the methods of repair by consulting with various contractors and professionals."), 8 ("Through this investigation, the plaintiffs learned that the form of 'pattern cracking' found in the basement walls of their home was due to a chemical compound found in certain basement walls constructed in the late 1980s and the early 1990s with concrete most likely from the J.J. Mottes Concrete Company.").)

The plaintiffs also described the damage to the Property as "cracking" in their depositions. (*See* ECF No. 32-2, Exhibit B, Deposition of Kenneth Courteau ("Courteau Depo.") at 46 (Q: "So . . . was the first time you saw the cracks October 2015, or did you see the cracks prior to that date?" A: "It would depend on what cracks you were referring to. Again, there's the cracks that are normal wear and tear cracks I've seen, I saw them all along. The cracks that are being caused by this reaction in the concrete, that's the first time I ever saw that."); ECF No. 36-4, Exhibit 3, Deposition of Cheryl Courteau ("Cheryl Courteau Depo.") at 36 ("[A]t this point we have been told we have cracks and we see them.").) Further, the parties' experts also described the damage to the Property in terms of "cracking" and "bulging." (*See* ECF No. 36-2, Exhibit A, Report of David Grandpre ("Grandpre Report") at 54-55 (describing damage to Property as "[i]rregular horizontal, vertical, and diagonal cracks in a map pattern," "map pattern cracks in the concrete," "[h]orizontal cracks extending into the concrete wall," "[m]ap-pattern

cracks in the concrete basement floor," "map-pattern cracks," "multiple vertical, horizontal, and diagonal map-pattern cracks," and "vertical cracks that were similar to normal concrete shrinkage cracks")[5]; (ECF No. 32-5, Exhibit E, Report of Leonard J. Morse-Fortier ("Morse-Fortier Report") at 6 (describing the walls of the Property as "cracked").)

The parties' experts both attributed the cause of the cracking and bulging in the Property to defective concrete. The plaintiffs' expert stated as follows:

> Concrete made with otherwise good and proper materials sets up, or hardens, in a matter of weeks, and then it continues to harden into a solid mass over its lifetime. This was not the case at the [Property]. The concrete was internally fractured, crumbling, and was no longer a solid mass. The concrete used at the [Property] contained a compound, most likely within the aggregate, which was subjected to a chemical reaction. As the chemical reaction took place, a chemical compound larger than the original elements formed, resulting in internal expansion that caused the concrete to fracture and expand. The chemical reaction initially damaged the inside of the concrete on a microscopic level. The reaction was hidden from view. The reactive compound is larger, and this expansion causes the concrete to fracture internally. Eventually the expansion became visible at the surface of the walls. One kind of such reaction is called alkali-silica reaction, commonly referred to as "ASR." A similar, but different, chemical reaction can occur if there is iron sulfide in the aggregate. As the iron sulfide oxidizes or rusts, the products of the reaction expand, fracturing the concrete. The chemical reaction was likely aided by water initially batched into the concrete, and later by water absorbed by the concrete. The source of water includes water vapor in the air within the basement and above grade on the exterior sides of the basement. My opinion is based on my observations at the [Property] and my previous experience investigating the cause of similar concrete deterioration characteristics in other locations where the concrete was reportedly supplied by Joseph J. Mottes Company of Stafford Springs, CT.

(Grandpre Report at 4.) The defendant's expert reached a similar conclusion:

> The cracks result from the oxidation and expansion of pyrrhotite, a reactive iron sulfide mineral present in the concrete aggregate. In the presence of water and air, the pyrrhotite oxidized and expanded, causing the concrete to crack and increasing

---

[5] The plaintiffs' expert also referred to "bowing" of certain facets of the plaintiffs' property, which he characterized as a form of "bulging." (*See* ECF No. 36-5, Exhibit 4, Deposition of David Grandpre ("Grandpre Depo.") at 84-85 (Q: "[Y]ou said there was bulging of the chimney outward, right, or upward?" A: "Upward." Q: "And then bowing, which is inward; is that right? Well, let me ask the question this way, is bowing a type of bulging?" A: "Yes." Q: "But bulging isn't necessarily a type of bowing?" A: "Correct.").)

the likelihood of additional water intrusion and further cracking. The process of deterioration has been ongoing for a long period of time. Mr. Courteau noted that he did not observe cracks at the time they purchased the house in 2006, though he also noted that there was very little of the concrete foundation wall that was exposed to view. So long as there is pyrrhotite present and the concrete is exposed to water and air, the deterioration may continue.

(Morse-Fortier Report at 6.) Thus, the evidence in the record suggests that the damage to the Property consists of cracking of the concrete—sometimes resulting in bulging of the walls and other structures—caused by the use of defective concrete. (*See also* Complaint at ¶ 9 ("The [concrete] aggregate used by the J.J. Mottes Concrete Company in manufacturing the concrete in [the time period in which the Property was constructed] contained a chemical compound which, with its mixture with the water, sand, and cement necessary to form the concrete, began to oxidize (rust) and expand, breaking the bonds of the concrete internally and reducing it to rubble.").) The plaintiffs' claimed damages therefore fall within the exclusions under the pre-2013 Policy for losses caused by ". . . cracking, . . . bulging or expanding of a building structure . . . ." and "a defect, . . . a fault or unsoundness in materials used in construction . . . ." (Pre-2013 Policy at 8, 12.)

The case of *Kim v. State Farm Fire & Cas. Co.*, 262 F. Supp. 3d 1, 9 (D. Conn. 2017), is instructive on this point. The *Kim* case concerned a claim for coverage for similar damage to a covered property. *See id.* at 4 (noting that the plaintiffs' expert concluded their property contained "numerous spider-web cracks" and other defects most likely caused by "Aklali-Silica-Reaction . . . which . . . typically causes the type of distress Plaintiffs' Property was experiencing 15 to 20 years after the foundation is poured" (internal quotation marks and alterations omitted)). A portion of the insurance policy in *Kim*, like the pre-2013 Policy in this case, excluded coverage for "settling, cracking, shrinking, bulging or expansion" and "defect, weakness, inadequacy, fault or unsoundness in . . . materials used in construction or repair." *Id.* at 8. The *Kim* court

concluded that this precluded the plaintiffs from obtaining coverage under this provision. *See id.* at 9 ("In light of the evidence presented by both parties that the Property's foundation was cracked and the concrete used was defective, the Court finds Plaintiffs' loss falls within Policy exclusions and summary judgment must be granted in favor of Defendant." (emphasis omitted)). As in *Kim*, the exclusions under the pre-2013 Policy for "cracking," "bulging," and "defects" in construction materials preclude coverage under the pre-2013 Policy for the damage to the plaintiffs' Property.

The plaintiffs attempt to distinguish *Kim* on the basis that the policy in that case "excluded losses both *caused by* and *consisting of* cracking and defective materials," whereas the pre-2013 Policy provides that "the loss must be *caused by* the excluded item." (ECF No. 36 at 13 (emphases in original).) This distinction does not help the plaintiffs. As noted above, the plaintiffs' expert and the complaint both allege that the cracking of the walls was caused by the use of defective concrete to construct the Property. Thus, if the cracking itself is deemed the "loss" (a term not defined in the Policy), the undisputed evidence in the record shows that that "loss . . . result[ed] from . . . a defect . . . in materials used in construction," (Pre-2013 Policy at 12), and thus is excluded from coverage. On the other hand, if "loss" is accorded its ordinary meaning in this context, i.e., "[t]he amount of financial detriment caused by an . . . insured property's damage," Garner, Black's Law Dictionary, Ninth Ed., then the loss was caused by cracking and thus is excluded under the cracking exclusion. (Pre-2013 Policy at 8 ("We do not pay for loss caused by . . . cracking . . . of a building structure.").) In either case, the damage falls under the exclusions in the pre-2013 Policy. The plaintiffs have failed to present any other potential cause of the damage to the Property.

The plaintiffs also contend that the exclusion for "settling, cracking, shrinking, bulging or expansion" applies only to losses caused by "*normal*, gradual readjustment of the building materials in a home." (ECF No. 36 at 13 (internal quotation marks omitted).) In support of this contention, they cite *Winters v. Charter Oak Fire Ins. Co.*, 4 F. Supp. 2d 1288 (D.N.M. 1998). (*See* ECF No. 36 at 13.) To be sure, *Winters* held that a coverage exclusion for "settling, cracking, shrinking or expansion" encompassed only "gradual natural process[es] that every building endures." *Id.* at 1295. The *Winters* court based this conclusion, however, on the placement of this exclusion under the heading of "wear and tear." *See id.* at 1296 ("[T]his construction of the term is bolstered by the fact that the [insurance policy] lists the 'settling, cracking, shrinking or expansion' [exclusion] under a general hearing of 'wear and tear.'"). In this case, the "settling, cracking, shrinking, bulging or expansion" exclusion in the Policy is not contained under a general "wear and tear" heading; indeed, as noted above, there is a separate exclusion for "wear and tear." *See* note 4, *supra*. The plaintiffs also cite the Supreme Court of Alaska's decision in *West v. Umilaik Ins. Co.*, 8 P.3d 1135 (2000). (*See* ECF No. 36 at 13 (citing *West*, 8 P.3d at 1138-39).) Like *Winters*, however, *West* dealt with an exclusion to an insurance policy for "settling," which was situated in close proximity to an exception for "wear and tear." *See West*, 8 P.3d at 1138-39 (concluding that exclusion for "settling" contained in same category as "wear and tear" did not apply to rapid settling of portion of property caused by burst pipe). By contrast, the exclusion for "cracking, . . . bulging or expansion" is situated in an entirely different section of the pre-2013 Policy form the exclusion for "wear and tear." (*See* Pre-2013 Policy at 7-8, 10-12.)

I therefore conclude that the plaintiffs' claim for damages falls within the exclusions in the pre-2013 Policy.

### 2. Post-2013 Policy

The post-2013 Policy contains a provision addressing coverage in the event of a

"Collapse":

2. Collapse

a. "We" pay for direct physical loss to the covered property involving the collapse of a building or a part of a building . . .

. . .

b. In this Incidental Property Coverage:

1) collapse of a building or a part of a building means an abrupt caving in, falling in, falling down, or giving way of the building or the part of the building that prevents the building or the part of the building from being occupied for the purpose for which it was intended just before caving in, falling in, falling down, or giving way; and

2) the following are not considered to be in a state of collapse:

a) a building or a part of a building that has not caved in, fallen in, fallen down, or given way even if it displays evidence of bending, bowing, bulging, cracking, expansion, inadequate load bearing capacity, leaning, sagging, settling, or shrinkage;

b) a building or a part of a building in danger of caving in, falling in, falling down, or giving way; or

c) a part of a building that has not caved in, fallen in, fallen down, or given way even if it has separated from another part of the building.

(ECF No. 32-1, Exhibit 2 ("Post-2013 Policy") at 10-11.) For the reasons that follow, I conclude

that this language unambiguously precludes the plaintiffs' claimed damages to the Property.

The evidence in the record does not demonstrate that the Property is in a state of

"collapse" under the post-2013 Policy. The steady deterioration and cracking of the concrete

foundation and walls of the Property do not constitute "an abrupt caving in, falling in, falling down, or giving way of the building or . . . part of the building that prevents the building or the part of the building from being occupied for the purpose for which it was intended."  First, the record is clear that no event has occurred that "prevents the building . . . from being occupied for the purpose for which it was intended just before" such an event occurred.  Indeed, the plaintiffs and their expert agree that the plaintiffs have lived in the Property since 2006, the Property remains habitable, and the plaintiffs continue to occupy it as a home.  (*See* Courteau Depo. at 51 (Q:  "Has anyone told you that your home is in danger of falling down immediately?"  A:  "No." Q:  "In the next six months?"  A:  "No."  Q:  "The next year?"  A:  "No.  No one has told me that."), 80 ("And you're still living in the house?"  A:  "Unfortunately, yes." . . . Q:  "Has anyone told you that the house is unsafe?"  A:  "No."  Q:  "Or that you need to move out."  A:  "No."); Cheryl Courteau Depo. at 40 (Q:  "Has anyone told you that there is any chance that the [Property] will collapse soon, and when I say soon I mean in the next six months or a year?"  A: "No one has said that."); Grandpre Depo. at 85 (Q:  "Is the Courteau house suitable for being occupied for the purpose for which it was intended?"  A:  "Yes."  Q:  "Is the Courteau basement suitable for being occupied for the purposes in which it was intended?"  A:  "Yes." . . . Q:  "Are the concrete walls at the [Property] in danger of caving in?"  A:  "Not immediately."  Q:  "Are they in danger of falling in?"  A:  "At some time in the future.  I can't say when."); Grandpre Report at 5 ("In my engineering opinion, the severity of deterioration of the concrete basement walls . . . *will continue to weaken until they are no longer competent to perform their intended function of supporting the weight of the floors, walls, and roof.*" (emphasis added)).)

The damage is therefore not covered under the post-2013 Policy.  *See Zamichiei v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-CV-739 (VAB), 2018 WL 950116, at *7 (D. Conn. Feb. 20,

2018) ("The insurance policy at issue here unambiguously covers only 'abrupt' collapse, and the [plaintiffs] have not shown that their home has collapsed within the meaning of the Policy. The [plaintiffs'] expert stated that, at the time of inspection, the Property's foundation did not require immediate replacement and was not structurally dangerous."); *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 287 F. Supp. 3d 153, 160 (D. Conn. 2017) (concluding plaintiffs' claim for damages due to slow deterioration of concrete did not fall under policy coverage for "abrupt falling down or caving in" because "[n]o part of [the plaintiffs' home] collapsed—abruptly or otherwise—and their entire home can still be occupied for its current intended purpose"); *Chernosky v. Amica Mut. Ins. Co.*, No. 3:17-CV-01047 (VLB), 2018 WL 529956, at *4 (D. Conn. Jan. 24, 2018) (concluding that insurance policy covering "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose" did not apply to home that was still standing and where plaintiff still lived); *Makufka v. CSAA Fire & Cas. Ins. Co.*, 304 F. Supp. 3d 275, 280 (D. Conn. 2018) (same); *Enderle v. Amica Mut. Ins. Co.*, No. 3:17CV1510 (WWE), 2018 WL 2048364, at *3 (D. Conn. May 2, 2018) (same).

The plaintiffs contend that the phrase, "occupied for the purpose for which it was intended" is ambiguous as used in the post-2013 Policy. (ECF No. 36 at 22.) This argument rests on the contention that "intended" may be defined as "designed." (*Id.* at 23 (citing Oxford American Dictionary and Thesaurus).) The plaintiffs contend that the Property is not capable of being "sold for its intended or designed purpose," and that "no willing purchaser would purchase the home for use as a single-family residence, at least without substantial discount in an amount sufficient to remedy the condition." (*Id.* at 24.) The problem with this argument is that the Policy requires an event that prevents the building from being "occupied" for the purpose for

which it was intended before the event occurred, not one that prevents (let alone merely hinders) the building from being "sold" for the purpose for which it was intended. And the fact remains that the plaintiffs have continued to occupy their home and to use it as a dwelling—its intended purpose. There is no evidence in the record indicating that they cannot continue to live at the Property for at least the near future. As long as the plaintiffs can safely remain in their home their contention that the property cannot be occupied for the purpose for which it was intended will fall wide of the mark.

Other parts of the "collapse" provision confirm there is no coverage here. As noted, the physical manifestation of the damage to the Property has been described as "cracking," "expansions," and "bulging." But the "collapse" definition specifically excludes these harms in the absence of something more. The post-2013 Policy specifically excludes coverage for "a building or a part of a building that has not caved in, fallen in, fallen down, or given way even if it displays evidence of bending, bowing, bulging, cracking, expansion . . . leaning, sagging, settling or shrinkage." (Post-2013 Policy at 11.) Thus, the post-2013 Policy specifically excludes the plaintiffs' claimed damages from its definition of "Collapse." *See Liston-Smith v. CSAA Fire*, 287 F. Supp. 3d at 161 (concluding insurance policy did not cover deteriorating concrete in property in part on basis that the policy "specifie[d] that walls that exhibit cracking are not considered to be in a state of collapse").

Further, the slow deterioration of the concrete in the Property is not an "abrupt" event for the purposes of the post-2013 Policy. As I noted in my ruling in *England v. Amica Mut. Ins. Co.*, No. 3:16-CV-1951 (MPS), 2017 WL 3996394 (D. Conn. Sept. 11, 2017), the "ordinary meaning of the word 'abrupt' is 'characterized by or involving action or change without preparation or warning.'" *Id.* at *5 (quoting *Merriam Webster's Collegiate Dictionary* (10th ed. 1994).) The

plaintiffs do not allege that their property "abruptly" collapsed within the meaning of the Policy, or that any change occurred to the Property "without preparation or warning." Instead, they cite a competing definition of "abrupt" as "sudden *or* unexpected." (*See* ECF No. 36 at 20 (citing "Abrupt" Definition, Dictionary.com, http://dictionary.com.reference.com/browse/abrupt).) The plaintiffs contend that "the term 'abrupt' can reasonably mean [either] sudden [or] unexpected, rendering the term ambiguous." (*Id.*)[6]

The word "abrupt," however, does not stand alone in the collapse provision, and its context confirms that it unambiguously conveys a temporal meaning. *See, e.g.*, *Sayers v. Rochester Telephone Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091 (2d Cir. 1993) ("Although the parties dispute the meaning of specific contract clauses, our task is to determine whether such clauses are ambiguous when read in the context of the entire agreement." (internal quotation marks omitted)). "Abrupt" as used in the collapse provision modifies "caving in, falling in, falling down, or giving way," and the event it describes works a dramatic and *temporally sudden* change in the state of the insured property, i.e., it is an event that "prevents the building … from being occupied for the purpose for which it was intended *just before*" the event occurred. (Post-2013 Policy at 11 (emphasis added).) It would strain the imagination to map such language onto a process that occurred gradually, over the years, as the deterioration of the concrete in the Property undisputedly did. How would one pinpoint the moment "just before" such a slow-moving series of changes reached the point at which the Property became uninhabitable? Further confirmation that the term "abrupt" in the collapse provision means "quick" or "temporally sudden" appears in the part of that provision stating that a collapse has not occurred when "a

---

[6] In *England*, the plaintiff did not argue that the term "abrupt" was ambiguous. 2017 WL 3996394 at *5.

building … is *in danger of* caving in, falling in, falling down, or giving way." (*Id.* (emphasis added)). Those words, too, convey a sense of imminence, of an event that is about to occur, which is at odds with the gradual process of deterioration described by the plaintiffs and their expert. (ECF No. 18 para. 10 (alleging that the process of "deterioration … continues to advance" and "[i]t is only a question of time until the basement walls . . . will fall in"); Grandpre Report at 5 ("Cracks formed as the deterioration process progressed . . . . Eventually the concrete deteriorated to the point where it was no longer the solid mass it was designed to be."). In short, the Policy's usage of the term "abrupt" unambiguously does not include a gradual process taking place over decades. *See Jemiola v. Hartford Cas. Ins. Co.*, No. CV-15-6008837-S, 2017 WL 1258778, at *11 (Conn. Super. Ct. Mar. 2, 2017) (concluding the same with respect to gradual deterioration of concrete); *England*, 2017 WL 3996394 (concluding "abrupt" unambiguously did not encompass slow deterioration of concrete of property); *see also Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 541 (2002) ("We conclude, therefore, that, as used in these [insurance] policies, the term 'sudden' requires that the release in question occurs *abruptly or within a short amount of time*." (emphasis added)).[7]

---

[7] The plaintiffs also argue that the fact that the post-2013 Policy provides coverage for a "collapse" if it has been caused by "decay, but only if no 'insured' knew of or could reasonably be expected to suspect the presence of such decay prior to collapse" (Post-2013 Policy at 10) augurs in favor of defining "abrupt" as "unexpected" and therefore providing coverage. (ECF No. 36 at 21.) This argument is off base, however, as there can be an "abrupt"—i.e., temporally sudden—collapse of a structure caused by long-running decay. *See Alexander v. General Ins. Co. of America*, No. 3:16-cv-59 (SRU), transcript of oral ruling, ECF No. 22 at 13-14 (D. Conn. July 7, 2016) (providing the following hypothetical example of an "abrupt" collapse caused by long-term decay: "There's termites in the house. No collapse. They're eating away; every day they're eating away. No collapse. They keep eating away. Finally, they eat enough that the beam fails. . . . Now you have a collapse or falling in. The fact that it was caused by termites and it was a slow process doesn't mean you didn't have an abrupt collapse. You did, when the beam failed . . . .").

In opposing this conclusion, the plaintiffs cite four inapposite decisions by district courts in other Circuits concerning instances where buildings were rendered unusable. (*See* ECF No. 36 at 17 (citing *Scorpio v. Underwriters at Lloyd's, London*, No. CA 10-325 ML, 2012 WL 2020168, at *6 (D.R.I. June 5, 2012) (concluding that policy provision regarding collapse was ambiguous as applied to situation in which part of building "deflected . . . causing [it] to be unsuitable for occupancy" but the building was still standing); *Landmark Realty, Inc. v. Great Am. Ins. Co.*, No. CIV. JKS 10-278, 2010 WL 5055805, at *5 (D. Md. Dec. 3, 2010) (concluding insurance policy defining collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose" but also stating that "a building that is standing . . . is not considered to be in a state of collapse" was ambiguous where building was still standing but damage had occurred that "resulted in the entire building being unusable for its intended purpose"); *Malbco Holdings, LLC v. AMCO Ins. Co.*, 629 F. Supp. 2d 1185, 1197 (D. Or. 2009) (concluding that due to ambiguity, term "collapse," which policy defined as "abrupt falling down or caving in," had to be construed to apply where "at least part of the [property] (1) abruptly fell down or caved in, (2) such that it could not be occupied for its intended purpose . . ."); *Ken Johnson Properties, LLC v. Harleysville Worcester Summary Ins. Co.*, No. CIV. 12-1582 JRT/FLN, 2013 WL 5487444, at *12 (D. Minn. Sept. 30, 2013) (concluding that definition of "collapse" was ambiguous because, although building was still standing, part of it could not be occupied for its intended purpose; policy thus had to be construed to cover damage resulting in portion of building being rendered unusable).). But ambiguity is context-specific, and there is no similar ambiguity in this case

because the Property both can be occupied for its intended purpose *and* remains standing.[8]  *R.T. Vanderbilt Co. v. Hartford Accident and Indemnity Co.*, 171 Conn. App. 61, 88 92017) ("Context is often central to the way in which policy language is applied; the same language may be found both ambiguous and unambiguous as applied to different facts . . . .  Language in an insurance contract, therefore, must be construed in the circumstances of a particular case, and cannot be found to be ambiguous or unambiguous in the abstract."  (internal quotation marks and alterations omitted)).

The only potentially apposite case the plaintiffs cite is *130 Slade Condo. Ass'n, Inc. v. Millers Capital Ins. Co.*, No. CIV.A. CCB-07-1779, 2008 WL 2331048 (D. Md. June 2, 2008).  That case concerned an insurance policy, which, like the post-2013 Policy, provided "collapse" coverage for "[a]n abrupt falling down or caving in event."  *Id.* (emphases omitted).  The case concerned the plaintiff's claim for damages caused when its property, without warning, partially caved in—evidenced by a "loud noise sounding like a truck had hit the building."  *Id.* at *1-2. (internal quotation marks omitted).  The court concluded that coverage applied because a portion of the plaintiff's property had "buckled approximately three inches down and three inches to the south."  *Id.* at *1.  Further, a professional engineer who inspected the damage the day after the "loud noise" was heard concluded "the building was in danger of further collapse and had to be evacuated immediately."  (*Id.* (internal quotation marks omitted).)  That is not what happened here.  The plaintiffs do not allege that the Property buckled or that it is unsafe—as noted above, the evidence in the record would not support any such assertion—or that there was any temporally sudden event that caused the cracking.  Thus, *130 Slade* is also inapposite.

_____

[8]  I note, however, that unlike in these cases, the post-2013 Policy does not exclude coverage simply because a building "remains standing."

The plaintiffs also contend that the post-2013 Policy's definition of "collapse" is contradictory because it applies to circumstances involving a "caving in" or "giving way" even where there has not been a total falling down. (*See* ECF No. 36 at 17.) This contention misreads the "collapse" provision in the Policy. The definition of "collapse" has at least three main components: "an (1) abrupt (2) caving in, falling in, falling down, or giving way of the building or the part of the building (3) that prevents the building or the part of the building from being occupied for the purpose for which it was intended just before caving in, falling in, falling down, or giving way." (Post-2013 Policy at 11.) Under this definition, there can be covered "collapses" without a total falling down. For example, if the ceiling of a property abruptly caved in a few inches but the property remained standing, it would still constitute a "collapse" under the post-2013 Policy if it rendered the property unusable for occupation. Thus, the post-2013 Policy's definition of collapse is not contradictory—and it is certainly not so as applied to this case. In any event, even if the plaintiffs could establish that the Property had "caved in" or "given way" in any meaningful sense, they still could not satisfy the "abrupt" and intended purpose portions of the "collapse" definition recounted above. For these reasons, I conclude that the damage to the plaintiffs' Property is not covered under the post-2013 Policy.

As such, I conclude that the damage to the plaintiffs' Property is not covered under the defendant's Policy. Thus, the defendant is entitled to summary judgment on the plaintiffs' breach of contract claim.

**B.      Breach of the Implied Covenant of Good Faith and Fair Dealing Claim**

The defendant contends that the plaintiffs' breach of the implied covenant of good faith and fair dealing claim fails due to the dismissal of the breach of contract claim. (*See* ECF No. 32 at 27.) "Bad faith in general implies both actual or constructive fraud, or a design to mislead or

deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 795 (2013). "Accordingly, because the covenant of good faith and fair dealing only require[es] that neither party [to a contract] do anything that will injure the right of the other to receive the benefits of the agreement, it is not implicated by conduct that does not impair contractual rights." *Id.* (internal quotation marks omitted). Here, the plaintiffs' bad faith claim was predicated on the same conduct as their breach of contract claim—the defendant's denial of their claim under the Policy. (*See* Complaint at ¶¶ 21-29.) As such, the failure of the plaintiffs' breach of contract claim dooms their good faith and fair dealing claim. *See Capstone Bldg Corp.*, 308 Conn. at 796 ("Unless the alleged failure to investigate led to the denial of a contractually mandated benefit in this case, the plaintiffs have not raised a viable bad faith claim."); *Ridley v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 3:11 CV 1713 WWE, 2014 WL 3687739, at *3 (D. Conn. July 22, 2014) (granting summary judgment on breach of implied covenant of good faith and fair dealing claim predicated on same conduct as breach of contract claim subject to dismissal); *Chorches v. Stewart Title Guar. Co.*, 48 F. Supp. 3d 151, 157 (D. Conn. 2014) ("Because plaintiff's contract claim fails, so too does his claim of bad faith denial of coverage.").

I therefore grant the defendant summary judgment with respect to the plaintiffs' breach of the implied covenant of good faith and fair dealing claim.

## V.    Conclusion

For the reasons set forth above, the defendant's motion for summary judgment (ECF No. 31) is granted. The Clerk is directed to enter judgment in favor of the defendant and to close this case.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
               September 5, 2018